# AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Special Agent Matt McKnight, being duly sworn, depose and state as follows:

1. I have been employed by the Drug Enforcement Administration (hereinafter, "the DEA") as a Special Agent for approximately 14 years. My duty assignment since October 2003 has been St. Louis, Missouri. Prior to my assignments with DEA, I received seventeen weeks of training in narcotics investigations from the DEA Academy located in Quantico, Virginia. I have furthermore received specialized DEA training from the DEA in Quantico, Virginia, in Conspiracy and Complex Investigations.

2. During the course of my law enforcement experience, I have participated in numerous complex investigations of drug-trafficking organizations dealing in cocaine, marijuana, heroin, methamphetamine and other controlled substances. I have participated in numerous drug investigations which have resulted in the seizure of cocaine, marijuana, and heroin. I am familiar with and have used normal methods of investigation, including, but not limited to: visual surveillance, questioning of witnesses, search and arrest warrants, informants, pen registers, precision location information, confidential sources and undercover agents, and court-authorized wire interceptions. My training includes, but is not limited to: investigating the manufacture, possession and distribution of controlled substances listed within the Controlled Substance Act; executing search and arrest warrants involving drug offenses; gathering drug and non-drug evidence; undercover assignments; supervising and utilizing informants; clandestine laboratories; smuggling; money laundering; and monitoring drug-related conversations in other cases through court authorized electronic eavesdropping. I have attended DEA courses in money laundering investigations and have participated in money laundering investigations during my career.

1

3. I make this affidavit in support of the government's applications for the issuance of a seizure warrant for the following property:

    a. 2006 Augusta Grand A109S Serial 22022 Helicopter, tail number N290FD, registered to Aerotrust Service Corporation (the "Helicopter").

4. Incorporated by reference in this affidavit are seizure warrants for the following assets as approved by the Honorable Judge David D. Noce on October 28, 2016 (16-mj-251; 16-mj-252; 16-mj-253; 16-mj-254; 16-mj-255):

    a. all monies, funds, monetary instruments, stocks, bonds, securities, and other property valued at up to $11,599,000 in, credited to, or associated with Wells Fargo Advisors Command Account # ▮▮▮▮3003 in the name of Resguarda Sociedad De Corretaje De Seguros, C.A. (the "Command Account");

    b. all monies, funds, and monetary instruments, stocks, bonds, securities, and other property valued at up to $12,385,000 in, credited to, or associated with Wells Fargo Advisors account # ▮▮▮▮-2338 in the name of Resguarda Sociedad De Corretaje De Seguros, C.A. (the "Brokerage Account");

    c. a 100-foot 2014 Ferretti Yacht named "Navigante," Hull #745513 (the "Gibelli Yacht);

    d. a Raytheon Hawker 800 fixed wing multi engine aircraft, Tail number #N304AT, Serial number 258257 (the "Plane"); and

    e. an 82-foot 2015 "Pershing" Yacht named "Panacea" Hull #XFAP8207H415 ("Della-Polla Yacht").

5. As set forth below, there is probable cause to believe that the Helicopter is subject to seizure and forfeiture as property involved in transactions in violation of 18 U.S.C. § 1960, which criminalizes the operation of an unlicensed money transmitting business, and/or as property involved in money laundering in violation of 18 U.S.C. § 1956.

6. The information below suggests that Jorge Vergara-Lopez ("Vergara") received the Helicopter in lieu of commissions that he was owed for his role in a scheme to conduct an unlicensed money transmitting business.

7. As explained further below, Vergara worked with Alex Palencia ("Palencia"), Fabrizio Della Polla-Simone ("Della Polla") and others, both known and unknown, to expedite the approval of invoices submitted by their corporations in order to release U.S. dollars ("USD") by the Venezuelan CADIVI system, at a preferred rate. A large number of the USD was then used to exchange currency on behalf of others in connection with the Venezuelan black market currency exchange.

8. Palencia and Della Polla paid approximately $8 to $10 million USD in commissions to Vergara. However, for approximately $2 million of the commissions that Vergara earned, the parties agreed that amount would be "loaned" back to a seafood venture owned by Palencia, Della Polla and another individual. Palencia and Della Polla paid off approximately $750,000 of the principal amount owed on this loan before the seafood venture was dissolved.

9. In June 2016, Della Polla transferred the Helicopter to Vergara as payment for the remaining amount of Vergara's unpaid commissions.

10. The information contained in this affidavit is based on statements and information from witnesses, my personal knowledge and observations during the course of this investigation, my personal training and experience as a criminal investigator, and my review of records, documents, and other physical evidence obtained during this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included each and every fact known to me concerning this investigation. Rather,

3

I have set forth herein only those facts which I believe are necessary to establish probable cause to support the warrants requested herein.

## LEGAL BACKGROUND

11. Title 18, United States Code, Section 1956(a)(1)(A) provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity commits a federal crime.

12. Title 18, United States Code, Section 1956(a)(1)(B) provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity commits a federal crime.

13. The term "specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7)(A) and § 1961(1) to include, among other things, violations of 18 U.S.C. § 1960.

14. Title 18, United States Code, Section 1960(a) provides that whoever conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business commits a federal crime.

15. Title 18, United States Code, Section 1960 defines an "unlicensed money transmitting business" as one "which affects interstate or foreign commerce in any manner or degree and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, whether or not the

4

defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

16. Title 18, United States Code, Section 1960 further defines "money transmitting" to include the transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

17. The majority of States, including Florida, require money transmitting businesses to obtain a license and comply with other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony.

18. The Florida Money Transmitter's Code, Fla. Stat. Ann. §§ 560.101 *et seq.*, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation. Fla. Stat. Ann § 560.125(1). Violation of the money transmitter statute is a felony. Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. Ann. § 560.103(11). The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise." Fla. Stat. Ann. § 560.103(10).

5

19. Missouri likewise requires money transmitters to register with the state. The Sale of Checks Law, Mo. Rev. Stat. § 361.700 *et seq*. requires that any person within the state of Missouri issuing checks for consideration must obtain a license from the Director of Finance. Mo. Rev. Stat. § 361.705. Section 361.700(2) defines "check" to include "any electronic means of transmitting or paying money." Before a license can be issued to an applicant, the director must "investigate[] and determine whether the character, responsibility, and general fitness of the principals of the applicant or any affiliates are such as to command confidence and warrant belief that the business of the applicant will be conducted honestly and efficiently and that the applicant is in compliance with all other applicable state and federal laws." Mo. Rev. Stat. § 361.715.

20. In addition to registration required by the States of Florida and Missouri, Title 31, United States Code, Section 5330 requires any person who owns or controls a money transmitting business to register that business with the Secretary of the Treasury, through the Financial Crimes Enforcement Network (FinCEN). This registration requirement applies in addition to any State licenses that may be required. 31 U.S.C. § 5330(a)(3).

21. Federal regulations require money transmitting businesses not in existence as of December 31, 2001 to register with the Financial Crimes Enforcement Network of the United States Department of Treasury ("FinCEN") within 180 days after the date the business was established. Such registration requires the name and location of the business and the name and address or each person who owns or controls the business, is a director or officer of the business, or otherwise participates in the conduct of the affairs of the business.

22. As defined in Title 31, United States Code, Section 5330(d)(1), a money transmitting business means any business other than the United States Postal Service which:

6

    (A)    provides check cashing, *currency exchange*, or *money transmitting or remittance services*, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in *the transmission of funds*, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions systems;

    (B)    is required to file reports under section 5313; and

    (C)    is not a depository institution (as defined in section 5313(g)).

Pursuant to 31 U.S.C. § 5313:

    (a)    When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identity the person for whom the transaction is being made.

As defined in 31 C.F.R. § 103.11(n)(3), a financial institution includes a "money services business" as that term is defined in paragraph (uu).

    23.    Title 31, Code of Federal Regulations, Section 103.11(uu), defines a money services business as each agent, agency, branch or office within the United States of any person doing business, whether or not on a regular basis or as an organized business concern in one or more of six capacities, which includes a money transmitter. 31 C.F.R. § 103.11(uu)(5)(i) defines a money transmitter as:

    (A)    Any person, whether or not licensed or required to be licensed, who engages as a business in accepting currency, or funds denominated in currency, and transmits the currency or funds, or

7

      the value of the currency or funds, by any means through a financial agency or institution, a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both, or an electronic funds transfer network; or

    (B) Any other person engaged as a business in the transfer of funds.

  24. Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) provide that any property, real or personal, that is involved in a transaction or attempted transaction in violation of Sections 1956 or 1960, of Title 18, and any property traceable to such property is subject to civil and criminal forfeiture. Thus, any property that is involved in the unlawful money transmitting business described herein, or which is traceable thereto, is subject to seizure under Title 18, United States Code, Sections 981(b) and 982(b), and Title 21, United States Code, Section 853(f).

## BACKGROUND ON THE VENEZUELAN CADIVI SYSTEM

  25. Based upon my training and experience, I know that, historically, many Venezuelan citizens have sought to protect their wealth from local economic, political and social factors by converting it to more stable banking systems in Europe and the United States. To avoid a flight of capital, the Venezuelan government has restricted the outflow of funds from their financial systems by imposing numerous barriers on currency exchange. In recent years, the Venezuelan government has enacted various policies and regulations which make the transfer of funds out of Venezuela difficult and complex.

  26. In February 2003, Venezuela enacted currency exchange controls which fixed the exchange rate of the Venezuelan bolivar to the U.S. dollar ("USD") at a rate controlled by the Venezuelan Government's Foreign Exchange Commission, or Comisión de Administración de Divisas ("CADIVI"). CADIVI is a government entity managed by the Venezuelan Finance Ministry with authority to regulate and impose restrictions on foreign currency exchange rates and

8

the procedures used to obtain foreign currencies. CADIVI has the authority to sell USD to individuals and corporations for limited use purposes that include the purchase of products or imports for certain industries, and other limited purposes identified by the government. USD sold by CADIVI has a preferential exchange rate. CADIVI maintains tight control of the outflow of USD from Venezuela's Central Bank and the certification process to exchange bolivars to USD is strict and bureaucratic.

27. The use of off-shore entities makes it difficult to trace the source and destination of these transactions. Many of these off-shore entities are located in jurisdictions with strong bank secrecy laws. Common off-shore locations include Antigua and Barbuda, Panama, the Bahamas, Barbados, the British Virgin Islands, the Cayman Islands and Netherlands Antilles. Verifying the true ownership of the off-shore company and source funds in such transactions is very difficult in light of these considerations, creating an inherent risk for United States banks which allow their customers to participate in such transactions. Registration of money transmitting businesses would require records to be kept and reports to be made that might provide transparency as to the nature of those transactions; conversely, the failure to register permits such businesses and their customers to conceal the true source and nature of those transactions.

## DIVENDI AMERICAS AND ZURICH DEVELOPMENT GROUP

28. Palencia and Della Polla jointly own Servencia, a poultry farm under development in Venezuela that was approved for payment by the Venezuelan CADIVI.

29. Palencia also controlled both Divendi Americas ("Divendi") and Zurich Development Group Incorporated ("Zurich"). Divendi maintained several bank accounts at Bank of America (the "Divendi Accounts"). Zurich maintained bank accounts at the following banks,

9

Bank of America, HSBC Bank (Panama) S.A., EFG Bank (Switzerland) and Banca Zarattini (Switzerland) (the "Zurich Accounts").

30. ▇ told investigators that both Divendi and Zurich received USD from the CADIVI system related to inflated invoices submitted by Servencia. A review of the Divendi Accounts shows that between January 1, 2012, and June 30, 2013, Divendi received in excess of $57 million USD from the CADIVI system. Limited bank records for the period June 26, 2012, through July 9, 2012, show that the Zurich Accounts received more than $4 million USD from the CADIVI.

31. ▇ further stated that the USD received from the CADIVI were then sold to other individuals and companies as part of the Venezuelan black market currency exchange, including (a) Hjalmar Gibelli-Gomez ("Gibelli") and his company, Resguarda Sociedad De Corretaje Fr Seguros, C.A. ("Resguarda"); and (b) Edgar Enrique Vargas Sandoval ("Vargas").

32. Resguarda is believed to be a large Venezuelan insurance company owned by Gibelli that traded in the Venezuelan currency black market. Resguarda maintained the following bank accounts with Wells Fargo Advisors, based in St. Louis, Missouri: account number ▇3003 (the "Command Account") and account number ▇-2338 (the "Brokerage Account"). Between October of 2011 and September of 2013, Resguarda received in excess of $6 million USD from the Divendi Accounts and in excess of $5 million USD from the Zurich Accounts. Gibelli confirmed with investigators that the USD wired from Divendi and Zurich was part of a black market exchange of USD and Venezuelan bolivars.

33. Vargas purchased in excess of $11 million USD from Palencia in exchange for Venezuelan bolivars. In 2015, Vargas pled guilty money laundering in violation of 18 U.S.C. §

10

1956(a)(3)(B) in the Southern District of Florida. Vargas told investigators he traded in the Venezuelan black market currency exchange and purchased USD from Palencia.

## VERGARA'S ROLE IN THE CONSPIRACY

34. ▓▓▓▓▓▓▓▓▓▓ needed their inflated invoices approved and released by the CADIVI at the preferred rate so they could sell the USD at the higher black market rate to other individuals and companies.

35. According to ▓▓▓▓▓▓▓▓▓▓, they began working with Vergara to facilitate approval of invoices by the CADIVI. Vergara purportedly used his contacts in the CADIVI to make sure that invoices submitted by Palencia and Della Polla continued to be approved at the preferred rate. Vergara told Palencia and Della Polla that he provided a similar service to other individuals.

36. ▓▓▓▓▓▓▓▓▓▓ stated that they paid Vergara a commission. ▓▓▓▓ stated that for every USD approved by the CADIVI, Vergara was to be paid 0.5 bolivar. Those bolivars would then be paid to Vergara in USD at the black market rate by Palencia. According to ▓▓▓▓▓▓▓▓▓▓ they paid Vergara between $8 and $10 million USD in commissions related to his services.

37. Bank records show that between May 2012 and January 2013, approximately $6 million USD was wired from the Divendi Accounts to either (a) BNP Paribus Bank account number ▓▓2379 in the name of Tarnell Investments Ltd., a British Virgin Islands company controlled by Vergara or (b) Wells Fargo Bank account number ▓▓3093 held by Vergara.

38. ▓▓▓▓ told investigators that he believes that Vergara was aware that Palencia was selling a portion of the dollars approved for payment by the CADIVI.

11

39. Although [redacted] stated that he never discussed with Vergara the sale of USD by Divendi on the black market, investigators obtained an email message (written in Spanish) between Palencia, Vergara and Della Polla, dated September 4, 2012, wherein the individuals discuss the black market exchange rates of the bolivars and USD. [redacted] told investigators that the email was in response to Vergara being unhappy with the delay of commission payment to him. The exchange rate had changed from the day that the invoice had been approved and when Vergara's commission had been determined and paid. [redacted] stated that he believed Vergara knew the delay in payment was caused by Palencia needing to find a buyer for additional dollars that were released.

40. In another string of email messages (also written in Spanish), dated August 13, 2012, [redacted] asked [redacted] if he could obtain $22 million USD in exchange for bolivars for his partner to purchase property. Vergara stated that his partner was with the government and that he was in front of him to protect him. During the conversation, [redacted] had Vargas enter the chat to see if Vargas was able to work out the deal with Vergara. As previously stated, Vargas is an associate of Palencia who also purchased dollars from Palencia and Della Polla through the black market exchange.

### TRANSFER OF THE HELICOPTER TO VERGARA

41. According to [redacted] Vergara agreed that, in lieu of being paid approximately $2 million in commissions owed, Vergara would "loan" the funds to Seaborn Group LLC ("Seaborn"), a seafood sales venture controlled by Palencia, Della Polla and one other individual. According to this arrangement, Seaborn would make payments, including both principal and interest on the loan, to Vergara.

42. Bank records obtained and information supplied by ▇▇▇ show that Seaborn and/or Divendi made regular payments to Vergara between January 2012 and May 2015. The total amount of these payments was approximately $1.25 million USD (comprising $751,000 in principal payments and approximately $507,000.00 in interest payments).

43. In April 2014, Seaborn filed for an Assignment of Benefit of Creditors and surrendered all documents, assets and creditor information to a trustee. Seaborn was then dissolved in October 2015. At that time, Vergara believed he was still owed approximately $1.2 million USD in unpaid commissions.

44. ▇▇▇ told investigators that he made an arrangement with Vergara to trade the Helicopter as payment on the remaining debt.

45. Information obtained from Aerotitle, the company that handled the sale of the Helicopter, reflected that the Helicopter was sold in June 2016 by Old Green Trees S.A, a Panamanian Corporation owned by Della Polla, as Trustor, to Aerotrust Services, as owner Trustee, for trust title (N290FD Trust). The voting trust agreement reflects the signatures of Scott Villanueva, Director of Airbreeze Services Pebles Taveras, Director of Aerotrust, and Rodolfo Saravia, President of Cofino Stahl y Compania Holding Limited, a corporation believed to be registered in the British Virgin Islands. Information received from representatives of the Federal Aviation Administration reflects that both Villanueva and Taveras are associated with Aerotrust Services and have registered numerous voting trusts wherein Aerotrust Services acts as the owner. Rodolfo Saravia is unknown to the investigation at this time. An internet search for Cofino Stahl y Compania reveals that the company appears to operate automobile dealerships in Guatemala.

Investigators reviewed banking documents that reflect Rodolfo Saravia Valenzuela is believed to be the CEO and shareholder of Cofino Stahl Y Compania SA, registered in Panama.

46. Investigators reviewed bank records for Vergara's Wells Fargo Bank account number ▮▮▮▮4329. On December 6, 2016, records show that a wire in the amount of $92,128.23 was sent to Industria De Trubo Propulsores, SA, in Spain. The translation of a Spanish notation on the wire states "50 percent credit helicopter invoice." This wire transfer was sent approximately 6 months after the transfers from Della Polla to the trust in the name of Cofino Stahl Y Compania SA.

47. ▮▮▮▮ told investigators that Vergara contacted him and told him that if the United States Government seized the Helicopter, Della Polla would still owe him the debt. Vergara also told Della Polla that he had listed the Helicopter for sale.

48. Information received from FAA states the Helicopter was issued a Standard Airworthiness Certificate on May 4, 2017.

49. ▮▮▮▮ informed investigators that on August 24, 2017, he had a chance meeting with Vergara. During that meeting, Vergara told ▮▮▮▮ that he was selling the Helicopter and that he had put the Helicopter in the name of another entity to avoid going through what Della Polla had gone through with his yacht. ▮▮▮▮ told investigators that Vergara was referring to the seizure of Della Polla's yacht by the United States Government.

## CONCLUSION

50. I hereby respectfully submit that there is probable cause to believe that Palencia, Della Polla and Vergara operated an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960, and that the Helicopter constitutes property involved in a transaction or attempted transaction in violation of Sections 1956 and/or 1960. As such, the

14

Helicopter is subject to civil and criminal forfeiture pursuant to Title 18, Sections 981(a)(1)(A) and 982(a)(1).

51. Because of the mobility of the property and ease of moving, hiding or transferring the property to be seized, a seizure warrant is necessary to preserve the property pending the outcome of the criminal investigation, and a protective order under Title 21, United States Code, Section 853(e) may not be sufficient to assure the availability of the property for forfeiture.

## REQUEST FOR SEALING

52. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

_____
MATT MCKNIGHT
Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me this 28th day of September, 2017

_____
HONORABLE DAVID D. NOCE
United States Magistrate Judge
Eastern District of Missouri

15